**GUAM POWER AUTHORITY, a public corporation, et al., Plaintiffs,**

v.

**BISHOP OF GUAM, a corporation sole, and Church of Christ-Latter Day Saints, Defendants.**

**Civ. No. 191–73.**

District Court of Guam.

Oct. 18, 1974.

Fred E. Bordallo, Agana, Guam, for plaintiffs.

Howard G. Trapp, Agana, Guam, for defendant Bishop of Guam.

## OPINION

DUENAS, District Judge.

The Guam Power Authority commenced this action on Friday, October 12, 1973, asking this Court to declare Sections 3 and 4 of Public Law 12–42 illegal and void. Public Law 12–42 amended Sections 21003, 21503(4) and 21553 of the Government Code of Guam for the purpose of reducing charges for utility services furnished to nonprofit educational facilities, churches, and publicly owned hospitals.

Ensuing joining of issues, Plaintiffs made a motion for Summary Judgment to declare that Sections 3 and 4 of Public Law 12–42 are illegal and void and of no force and effect. The motion was heard by the Court on May 17, 1974. Ensuing argument of the parties, the Court took the matter under advisement.

Plaintiff, Guam Power Authority (GPA), a public corporation, distributes and sells electric power to the citizens and residents of the Territory of Guam. Defendants, Bishop of Guam, a corporation sole, and the Church of Christ of the Latter Day Saints are customers of GPA and are favorably effected by Public Law 12–42 in that their electric power rates are in some way decreased by it.

Plaintiffs, Eugene Schaardt, Joaquin G. Blaz, Frank P. Torres, Charles W. Spero, and Tomas J. Flores are directors of GPA and customers of GPA who do not fall under that class of customers benefited by Public Law 12–42.

Section 2 of Public Law 12–42 effects the rates fixed by the Board on Utility Rates. The Board on Utility Rates determines the charges on all utility services furnished by the Government of Guam other than those furnished by GPA. The validity of Section 2 is not challenged by Plaintiffs and, therefore, is not in issue.

Section 3 of Public Law 12–42 amended Section 25103(4) of the Government Code of Guam, to read:

"(4) Establish and modify from time to time, without reference to the Board on Utility Rates, reasonable rates and charges for electric service, at least adequate to cover the full cost of such service, and collect money from customers using such service, all subject to any contractual obligation of the Board to the holders of any bonds, *provided, however, that the rate for services supplied to any nonprofit educational facility, church, or publicly-owned hospital, shall not exceed one half (½) of the minimum rate charged to any other customer*; enter into covenants to increase rates or charges from time to time as may be necessary pursuant to any such contractual obligation; and refund rates and charges collected in error in accordance with regulations prescribed by the Board." (The italicized material was added by Public Law 12–42).

Section 4 of Public Law 12–42 amended Section 21553 of the Government Code of Guam, to read:

"Section 21553. Amounts of rates and charges; refunds. Except to the extent otherwise permitted or required by an indenture or any contract relating to indebtedness incurred by the Board, all rates and charges shall at all times be fixed to yield annual revenues equal to the annual principal payments and interest charges and reserve fund requirements on all bonds at any time issued and outstanding hereunder, the annual system operation and maintenance costs and the annual principal payments and interest charges on all other outstanding indebtedness incurred by the Board, *provided, however, that the rate for services supplied to any nonprofit educational facility, church, or publicly-owned hospital shall not exceed one half (½) of the minimum rate charged to any other customer.* An indenture or contract of indebtedness may provide for payment from revenues of refunds of rates and

charges that are collected in error and that are refundable by the Board in accordance with regulations prescribed by it." (The italicized material was added by Public Law 12–42).

The effect of Public Law 12–42 is to create a special class of customers who will be charged a reduced rate for electricity furnished by GPA, while those customers not in that class will be required to pay a higher rate in order for GPA to maintain the same income level. Plaintiffs contend that the statute 1) is vague and ambiguous, 2) violates 48 U.S.C. § 1421b(p), in that it provides electric power at reduced rates to churches and sectarian institutions, 3) violates 48 U.S.C. § 1421b(n), by denying equal protection of the laws to the GPA customers who are unfavorably affected by the statute, 4) violates 48 U.S.C. 1421b(j), in that it impairs the contractual obligations of GPA, and 5) is void because Bill No. 352, which became Public Law 12–42, was vetoed by the Governor and returned to the Legislature while the Legislature was in recess and, therefore, was in effect pocket vetoed by the Governor.

To determine the outcome of this case, it is only necessary to consider Plaintiffs' first and third contentions.

The statute is vague and ambiguous in several respects. Section 21513 of the Guam Government Code requires the GPA to hold public hearings every time it establishes new rate schedules. The process of establishing new rate tables is not only time consuming but entails a substantial expenditure of funds. Section 21503(4) provides that GPA must establish reasonable rates and charges for electrical service which are at least adequate to cover the full cost of such service. Moreover, GPA, acting pursuant to the Guam Power Authority Revenue Bond Act of 1968, Section 21550 et seq., Government Code of Guam, entered into a bond indenture agreement under which the GPA Board covenanted among other things to pledge the revenues of its electric system to-wards the payment of bonds issued by it. Twenty-five Million Dollars ($25,000,000) worth of bonds were issued under such agreement, and the GPA Board also agreed under the indenture that it would establish and fix its rate structure so as to yield net revenues equal to at least 1.30 times its annual debt service. GPA has no other means of income other than the rates it charges for electrical service. Consequently in order to abide by the terms of Section 21503(4) and to meet its contractual obligations and at the same time to carry out the provisions of Public Law 12–42, GPA must hold hearings and change its rate schedules to reflect lower charges for the benefited class of customers and higher charges for the other class of customers. It is unclear from Public Law 12–42 whether or not the Legislature intended the GPA to undertake the substantial expense of holding hearings immediately and establishing new schedules or whether it intended for GPA to change its schedules at such a time that a change in the cost of furnishing electricity to its customers would require rescheduling. GPA clearly cannot reduce its rates to the benefited class of customers until it restructures its rate system. It simply is unclear from the amendments to Sections 21503(4) and 21533 whether the Legislature intended the law to become effective immediately or at such time as it becomes necessary to alter the rate system.

Furthermore, the language "shall not exceed one half (½) of the minimum rate charged to any other customer" is ambiguous. The GPA Electric Rate Book consists of eight different rate schedules for eight different classes of customers. The eight classes of service are: Residential Service, Governmental Residential Service, Small General Service, Large General Service, Government Institutions and Agencies (small), Government Institutions and Agencies (large), Public Street and Outdoor Lighting Service; Private Outdoor Lighting Service. It is extremely diffi-

cult, if not impossible, for GPA as well as the Court to determine which schedules are applicable to the benefited class of customers. The Legislature could have intended that each benefited customer should be charged at one half (½) the minimum rate for the class in which it falls. However, in each class there are different rates for the first so many kilowatt hours, another rate for the next so many kilowatt-hours, and so forth. For example, under Residential Service, the customer is billed as follows:

| First | 30 | Kwh or less | $1.95 | | |
|-------|-----|-------------|-----------|-----|-----|
| Next | 70 | " | $0.0504 | per | Kwh |
| " | 200 | " | $0.0336 | " | " |
| Over | 300 | " | $0.0246 | " | " |

Does the Legislature intend by the words "shall not exceed one half (½) of the minimum rate charged to any other customer" that the benefited customer be charged one half (½) of the $0.0246 per Kwh rate or one half (½) of the rate at each level depending upon the individual customers consumption.

If the Legislature intended that the schedule with the lowest rates of the eight be used, it is impossible to determine which schedule has the lowest rates. For one member of the benefited class, the residential service schedule might be best while another member might be better off under another schedule. The schedules are a complicated system of rate structures which take certain matters into account, such as maximum kilowatt demand. One schedule cannot fit every member of the benefited class.

The term "any customer" appears to mean that hospitals and large schools will be billed at one half (½) the rate of the smallest residence in Guam, yet such a result is not logical. Residences are billed only on their consumption of kilowatt hours of electricity, but large users, such as hospitals and schools, are billed both for their energy consumption as well as their energy demand, based on their highest demand in any 15-minute period in a given month. It is doubtful that the Legislature really considered the application of the law to the actual circumstances. The term "any customer" simply cannot be given a logical meaning by the Court.

■ Public Law 12–42 ambiguously defines the classes benefited by the law. The bill refers to churches as belonging to the benefited class, but it is unclear as to how inclusive the term "church" is intended to be. It can mean an organization for religious purposes. Williams v. Williams, 215 N.C. 739, 3 S.E.2d 334, 338. It can also have the more physical meaning of a place where persons regularly assemble for worship. Stubbs v. Texas Liquor Control Board, Tex.Civ. App., 166 S.W.2d 178, 180. If the word "church", as used in the statute, has the more abstract meaning of an organization for religious purposes, then it can be assumed that all meters in the name of religious organizations would be members of the benefited class regardless to what use the facility was actually put. For example, income producing property could be owned by religious organizations and consequently receive reduced power rates. On the other hand, if "church" is interpreted to mean a place where persons regularly assemble for worship, does this include merely sanctuaries, chapels, and cathedrals, or does it also include buildings adjacent there to such as parsonages, friaries, convents, fellowship halls, Sunday schools, and rectories? The term "church" is too vague to enable GPA to determine what customers are to be members of the benefited class.

The Legislature has attempted to alter a complex and extremely technical rate structure for electric utility services with a bill which is incomplete and which contains undefined terms.

"§ 472. *Indefiniteness and Uncertainty.* In the enactment of statutes reasonable precision is required. Indeed, one of the prime requisites of any statute is certainty, and legislative enactments may be declared by the courts to be inoperative and void for uncertainty in the meaning thereof.

This power may be exercised where the statute is so incomplete, or so irreconcilably conflicting, or so vague or indefinite, that the statute cannot be executed and the court is unable, by the application of known and accepted rules of construction, to determine what the legislature intended, with any reasonable degree of certainty . . . " 50 Am.Jur. on Statutes, p. 281.

"An act which is so uncertain that its meaning cannot be determined by any known rules of construction cannot be enforced. If no judicial certainty can be settled upon as to the meaning of a statute, the courts are not at liberty to supply one. It must be capable of construction and an interpretation; otherwise it will be inoperative and void. An act is void where its language appears on its face to have a meaning, but it is impossible to give it any precise or intelligible application in the circumstances under which it was intended to operate." In re Di Torio, 8 F.2d 279 (N.D.Ill., 1925).

Although the terms of Public Law 12–42 can be given a general intent, it is virtually impossible to give them any precise or intelligible application in the circumstances under which it was intended to operate.

In State v. Gaitskill, 133 Kan. 389, 300 P. 326, 328 (1931), the Supreme Court of Kansas addressed itself to the problem of uncertainty in statutes and adopted a rule set forth in 25 R.C.L. 810:

"Where an act of the legislature is so vague, indefinite and uncertain that the courts are unable to determine, with any degree of certainty, what the legislature intended, or is so incomplete or is so conflicting and inconsistent in its provisions that it cannot be executed, it will be declared to be inoperative and void." 300 P. 326, 328 (1931).

The Eastern District of Illinois recently applied the same standard:

"A legislative act or statute which is so vague, indefinite and uncertain that courts are unable, by accepted rules of construction, to determine, with any reasonable degree of certainty, what the General Assembly intended, or which is so incomplete or conflicting and inconsistent in its provisions that it cannot be executed, will be declared inoperative and void. The duty imposed by a statute must be prescribed in terms definite enough to serve as a guide for those who must comply with it." Whitfield v. Simpson, 312 F.Supp. 889, 897 (E.D.Ill., 1970).

Public Law 12–42 is so imprecisely drafted. It would be unfair to require this Court or GPA to determine which of the many interpretations were intended by the Legislature. The law is simply too indefinite and uncertain to be valid.

THE RELATION OF 48 U.S.C. § 1421b(n), TO PUBLIC LAW 12–42:

Section 1421b(n) of Title 48 of the United States Code, provides:

"No discrimination shall be made in Guam against any person on account of race, language, or religion, nor shall the equal protection of the laws be denied."

The equal protection clause of the Fourteenth Amendment to the Constitution of the United States was also made applicable to Guam by Section 1421b(u) of Title 48 of the United States Code.

It is Plaintiffs' contention that Public Law 12–42 reduces electric rates for a special class of customers at least 50% of the rate charged to other customers. Since GPA must maintain the same level of revenue to operate, the burden of making up the difference falls on customers outside the special class. Plaintiffs maintain that such a classification is arbitrary and capricious and deprives the individual Plaintiffs of their right to equal protection under the law. This Court agrees with Plaintiffs.

There is a scarcity of recent case law involving instances where municipally owned utilities provided special classes of customers with utility services at no charge or at greatly reduced rates. However, an excellent synopsis of case law on this issue is set forth in 50 A.L.R. at page 126.

There is abundant authority for the proposition that when a government undertakes to furnish a public service, such as the supplying of electricity to consumers other than itself, it acts in its proprietary capacity and cannot grant free or reduced rates, or otherwise make discriminations which would be unlawful if the service were rendered by an individual or private corporation. 50 A.L.R. 126.

There is some case authority holding that a government agency operating a public utility can give free or reduced rates to public, charitable, or religious institutions. However, the great weight of authority holds that any such discrimination is unlawful. Many Public Utility Commissions have invalidated such discriminatory practices.

In Re Elkhorn Light and Water Commission, (1923, Wis.), P.U.R. 1923E, 235, the commission held that the furnishing of electricity from a municipal plant to a consumer, at less than cost, constitutes an unreasonable discrimination in favor of the consumer, and casts a burden upon other customers in the municipality or upon the taxpayers.

In University of Montana v. Bozeman, (1923, Mont.), P.U.R. 1924A, 705, it was held that it would be unlawful for a municipal utility to grant a preference to the state through the furnishing of water to a state university at rates based merely on operating costs, exclusive of depreciation, interest, etc.,—as service to the school on such a scale would mean merely that the taxpayers of the municipality, or the water consumers thereof, must make up the deficiency for which the school-service rate did not compensate.

And, the Missouri Commission in Botts v. Brookfield, (1917, Mo.), P.U.R. 1917D, 224, held that the furnishing of water free from a municipal water plant to churches and schools in the city, while other consumers were charged for a like service, constituted unlawful discrimination.

In Cavanaugh v. Whitefish Municipal Water Utility, (1922, Mont.), P.U.R. 1922E, 198, where it appeared that water was taken by the public from a municipal water plant for fire protection, public buildings, and other public purposes, the commission said that to render the public these services without charge constituted unlawful discrimination in favor of taxpayers and against the water consumers.

And, on petition for the establishment of rates of a municipal electric utility, the commission in Re Hillis, (1926, Ind.), P.U.R. 1927A, 443, held that discrimination was shown against private consumers, in that the city paid nothing for street lighting, it being said that the utility should be paid a fair rate for all service rendered, whether rendered to an individual or to the city. And, it was held that the city's rate for service should be the same as the rate for the largest power consumer.

A city which operates a municipal lighting plant is not justified in charging itself for street lighting a sum per light which is less than the actual cost of rendering the service, since other consumers of electricity would thus be paying a part of the expense of lighting the streets. Bonser v. Electric Light Commission, (1920, Me.), P.U.R. 1920F, 183.

Public Law 12–42 forces the consumer of electricity to subsidize churches, educational institutions, and publicly-owned hospitals. Plaintiffs contend that the term "nonprofit educational institutions" is ambiguous, in the respect that it is unclear whether it includes Government of Guam schools. The Court is of the opinion that the law does include Government of Guam schools, as well as

hospitals operated by the Government of Guam within the benefited class.

 The electric power bills of the University of Guam, the Guam public schools, and the Guam Memorial Hospital must be substantial. To place the burden of providing half of their electric power requirements upon the ordinary consumer of electric power would be an onerous burden indeed. The placing of this public responsibility upon the consumer's shoulders, rather than upon the taxpayer's, is a capricious and arbitrary discrimination. No rational basis exists to force the consumer of electric power to subsidize the private functions of churches and private schools, or the public functions of government schools and hospitals.

Let Summary Judgment issue.